## People's Transit Company v. Louisville Railway Company.

(Decided June 24, 1927.)

### Appeal from Jefferson Circuit Court (Common Pleas, First Division).

1. Municipal Corporations.—Street railway company held authorized, as taxpayer of city, to maintain suit to restrain operation of bus line over city streets without franchise, suing for itself and for the use and benefit of other taxpayers.
2. Carriers.—Street railway, which had obtained franchise pursuant to Constitution, section 164, held entitled to maintain suit to restrain operation of bus line not complying with such law, on ground that competing carrier on highways between fixed termini may maintain action to prevent rival transportation company from operating similar and competing business without obtaining right to do so as prescribed by law.
3. Equity.—Street railway, operating bus lines on some streets without obtaining specific franchise, is not precluded by "clean hands" doctrine from bringing suit to enjoin operation of another bus line for failure to obtain franchise.
4. Municipal Corporations.—Bus line, operating on city streets, held required to obtain franchise as provided in Constitution, section 164; "franchise" being privilege of doing something which does

not belong to citizens generally by common right, since services rendered, rather than facilities employed, determine whether such section is applicable.

5. Constitutional Law.—In interpretation of Constitution, intention of makers, as gathered from employed language and purpose to be accomplished, should be applied.

6. Constitutional Law.—In arriving at intention of makers of Constitution, courts are not confined to actual words employed, but to effectuate evident purpose intended to be accomplished analogous situations and facts may be considered.

7. Appeal and Error.—It is duty of appellate court to decide case before it and take care of consequences afterwards.

ROBERT L. PAGE and ALLEN P. DODD for appellant.

ALFRED SELLIGMAN, CHAS. W. MILNER and CHURCHILL HUMPHREY for appellee.

O'NEAL & O'NEAL and RODMAN W. KEENON, amici curiae.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The parties to this litigation (the appellant and defendant below, People's Transit Company, and the appellee and plaintiff below, Louisville Railway Company) are corporations, and will be hereinafter referred to as the Transit Company and the Railway Company, respectively. The Railway Company owns and operates on the streets of the city of Louisville a street railway system for the transportation of passengers. Its cars run upon a fixed track, consisting of two rails laid on cross-ties at a fixed place in the streets it traverses, and it operates its vehicles (cars) between fixed termini on schedule time and with a uniform schedule of rates, and it obtained its franchise for such operation, in the manner indicated, pursuant to the provisions and requirements of section 164 of the present Constitution of the commonwealth.

The Transit Company, at the time of the filing of this action, operated on some of the streets of the city a number of busses in the same manner and for the same purpose, and which were propelled by motor power generated by gasoline. They were not run upon a fixed track located in the street, but upon any portion thereof that was the most convenient, and the wheels of the busses were rubber-tired instead of iron, with flanges to hold the vehicle on the fixed track, as is true with the cars of the Railway Company. As in the case of the Railway Company, a once-paid fare entitled the passenger of the Tran-

sit Company to travel from one terminus to another one, and there was no scaling of rates proportioned to the distance traveled.

As a citizen and taxpayer, and also for the protection of its acquired franchise rights, the Railway Company filed this action against the Transit Company in the Jefferson circuit court, seeking to enjoin it from operating its auto busses on the streets of the city, upon the ground that such operation was one coming within the provisions of section 164 of the 'Constitution, and also, as it contends, under the provisions of its section 163. The substance of the defense was that defendant's business, conducted in the manner it was being operated, did not come within the provisions of either of those sections, and that the city of Louisville by its legislative department had enacted an ordinance prescribing for such operations by means of auto busses from year to year, upon the operator complying with certain prescribed conditions and paying a prescribed nominal annual fee, all of which it had done. Appropriate pleadings and steps presented the issues, and upon final submission the court perpetually enjoined defendant from further engaging in its described operation until it obtained a franchise right to do so, as is prescribed by section 164 of our Constitution, and which was an express holding that defendant, while prosecuting its business as stated, was exercising a special and peculiar right in and to the use of the streets, and designated in the law as a "franchise," and which it must obtain in the legal manner, and, until done, it was operating without right, and the injunction was therefore issued.

On this appeal from that judgment, defendant makes two primary contentions, which are: (1) That plaintiff cannot maintain this action; and (2) that a proper interpretation and application of the two sections of the Constitution, supra, does not require it to obtain a franchise in order to prosecute its passenger transportation business upon the streets within the city, and in which it was engaged before it was enjoined. Other subsidiary contentions are made by it, but they are all in aid of and look to the establishment of the two primary ones mentioned above, and when thought to be of sufficient materiality they will receive due consideration in the course of this opinion.

1. Contention (1) is not very difficult of solution. It is shown in the record and admitted in briefs that the

Railway Company is a very large taxpayer in the city of Louisville, and we held in the case of Hilliard v. Fetter, 127 Ky. 95, 105 S. W. 115, that such a taxpayer might maintain for himself and for the use and benefit of other taxpayers an action on all fours with this one; i. e., to enjoin the unlawful exercise of a franchise without first complying with the constitutional requirements in its obtention; and to the same effect is the case of Merchants' Police & Telephone Co. v. Citizens' Telephone Co., 123 Ky. 90, 93 S. W. 642.

In addition to its right to maintain the action as a taxpayer, as was held in those cases, we held in the two recent cases of Reo Bus Lines v. Southern Bus Line Co., 209 Ky. 40, 272 S. W. 18, and Harrison v. Big Four Bus Lines, 217 Ky. 119, 288 S. W. 1049, that a competing carrier on the highways in Kentucky between fixed termini, and who has qualified and equipped himself under the law for the conducting of transportation business, may maintain an action to prevent a rival transportation company from operating a similar and competing business without first obtaining the right to do so, as is prescribed by the prevailing law. Other jurisdictions with apparent unanimity appear to have adopted the same rule of practice, and we deem it unnecessary to incumber the opinion with a recitation of the foreign cases so holding.

A subsidiary contention in substantiation of this one is the invoking by defendant of what is known as the "clean hands" doctrine; i. e., that plaintiff is and was itself engaged in operating bus lines on some of the streets within the city without having obtained a specific franchise for the purpose, and that its hands were thereby rendered unclean, and for that reason it cannot maintain this action; but we are not so impressed. The "clean hands" doctrine is a wholesome tool of equity, and will always be applied to accomplish the purpose of its original creation in cases and transactions where it was made to serve; but it was never employed to sanctify litigants, or to repel all sinners from courts of equity. As said in the case of Dunscombe v. Amfot Oil Co., 201 Ky. 290, 256 S. W. 427:

> "It does not apply to general iniquitous conduct unconnected with the transaction, and in which the adverse litigant had no connection, nor was otherwise interested. Neither does it take cognizance of all moral infirmities, since courts of equity are not

primarily engaged in the moral reformation of the individual citizen.''

Upon the same point as to the limitation of the application of the doctrine we said in the case of American Ass'n v. Innis, 109 Ky. 595, 60 S. W. 388, that:

> '' 'The maxim, considered as a general rule controlling the administration of equitable relief in particular controversies, is confined to misconduct in regard to, or at all events connected with, the matter in litigation, so that it in some measure affects the equitable relations subsisting between the two parties, and arising out of the transaction. When a court of equity is applied to for relief, it will not go outside of the subject-matter of the controversy, and make its interference to depend upon the character and conduct of the moving party in any way affecting the equitable right which he asserts against the defendant, or the relief which he demands.' See Id. section 399. The rule must be understood to refer to some misconduct in regard to the matter in litigation, of which the opposite party can in good conscience complain in a court of equity. See Snell, Eq. 25.''

The subject-matter involved in that case was title to certain real estate. One of the litigants sought to defeat his adversary because he had acquired his title from the commonwealth through some kind of alleged fraud, but which did not grow out of any transaction between the litigants themselves. The court denied the applicability of the doctrine and said:

> '' 'If a man suing for specific performance is shown to have defrauded the defendant in respect to the contract sued on, the maxim would prevent recovery; but not so if it were shown that the plaintiff, in acquiring title, has defrauded his own vendor, or cheated some third person. ''Clean hands'' means a clear record with respect to the transaction with the defendant, and not with respect to any third person.' Applying these principles to the facts of this case, the question suggests itself: What fraud have appellees been guilty of in this transaction, so far as appellants are concerned, and of which they may justly complain?''

To the same effect are the cases of Richardson v. Linney, 7 B. Mon. 571, Hamburg Bremen Fire Insurance Co. v. Ohio Valley Dry Goods Co., 160 Ky. 252, 169 S. W. 724, Ann. Cas. 1916B, 944, and Bennett v. Stuart, 161 Ky. 264, 170 S. W. 642.

If the manner of the acquisition of title to real property by one of the litigants in a contest concerning it, though conceded to be fraudulent, but not growing out of any transaction with the adverse party or his claim, does not come within the purview of the maxim, as was held in the Innis case, then it is difficult for us to see wherein it would apply in this case, when plaintiff's right to do the things complained of by defendant is alleged to be tainted. Moreover, by far the larger part of the bus service operated by plaintiff, and relied on in this case as a defense under the maxim under consideration, was performed outside of the limits of the city, and for the purpose of accommodating its street patrons in reaching their destinations.

It is further suggested, in extenuation of such operations by plaintiff, that it acquired the right to do so under its original franchise that it obtained from the city to conduct its railway transportation operations on and over the streets of the city. But whether that be true or not we will not undertake to determine, and suggest it only for the purpose of its tendency to establish good, instead of bad faith on the part of plaintiff. The effect of this insistence is that, although defendant may be wrongfully operating its business on the streets of the city, yet plaintiff may not legally object to it, although it is a citizen and taxpayer of the city, and engaged in a competitive business for which it has become duly qualified in every respect, solely because it has engaged in what is alleged to be a prohibited act entirely disconnected with the one sought to be enjoined. Tested by our opinions, supra, it is our conclusion that the maxim is inapplicable to the facts of this case. That being true, it follows that plaintiff has the right to presecute this action, and this defense is disallowed.

2. The involved sections of the Constitution, supra, relied on in support of defense (2), are:

Sec. 163. No street railway, gas, water, steam heating, telephone, or electric light company, within a city or town, shall be permitted or authorized to

construct its tracks, lay its pipes or mains, or erect
its poles, posts or other apparatus along, over, under
or across the streets, alleys or public grounds of a
city or town, without the consent of the proper leg-
islative bodies or boards of such city or town being
first obtained; but when charters have been hereto-
fore granted conferring such rights, and work has
in good faith been begun thereunder, the provisions
of this section shall not apply.

"Sec. 164. No county, city, town, taxing district
or other municipality shall be authorized or permit-
ted to grant any franchise or privilege, or make any
contract in reference thereto, for a term exceeding
twenty years. Before granting such franchise or
privilege for a term of years, such municipality shall
first, after due advertisement, receive bids therefor
publicly, and award the same to the highest and best
bidder; but it shall have the right to reject any or
all bids. This section shall not apply to a trunk
railway."

It is first insisted by defendant that section 164
should be read into section 163, so as to confine the fran-
chises and privileges mentioned in the former to the spe-
cific operations mentioned in the latter; i. e., to franchises
for the conducting of only the named operations men-
tioned in the latter section, which are street railways,
gas, water, steam-heating, telephone, or electric light
companies, and that, since it is not engaged in any of
those specifically named, it is not required to obtain the
franchise mentioned in section 164. Therefore it is
argued that all that can be exacted of it is a compliance
with the ordinance requirements and regulations of the
legislative department of the city, and that it has done
so in this case, and is therefore immune from the attack
made upon it in plaintiff's petition.

It is not necessary for the disposition of this case, in
view of our conclusions subsequently stated, to decide
that question; but, in passing, we may say that we enter-
tain grave doubt of its correctness, since to so hold would
not only convict the members of the constitutional con-
vention in adopting our Constitution of, at least, limited
vision in preparing and enunciating in the fundamental
law of the commonwealth a broad public policy relating

to most important public utilities requiring extraordinary uses of the streets, and that at the same time confining the operation of such promulgated policy to only the *known* public utilities existing at *that* time.

The members of the convention could not foresee the development of science or the accomplishments of inventive genius and there are cogent reasons for believing that in adopting section 163 the convention meant to apply its provisions and requirements to the *results* accomplished through and by the utilities expressly named therein, rather than confining them exclusively to such utilities as were expressly named. The latter, we repeat, would not only convict the convention members with possessing dull conception, but would likewise charge them with attaching more importance to the trifling circumstance of the *means* by which a public service may be performed than to the *actual performance* of that service by whatever means it may be done, or, differently stated, that they constitutionally prescribed for the shadow rather than for the substance. On the other hand, it would not be a difficult task to find and cite most persuasive authority to sustain the proposition that it was the intention of the convention in adopting section 163, to require all such operating public utilities and furnishing in any manner or by any method *any* of the *services* rendered by any of the expressly named companies therein, to obtain the consent of the city in which it operates before it was authorized to do so, and which was so held by the learned trial judge in this case.

However, as stated, we do not deem it necessary for us to determine that question in this case, since we are convinced that the all-inclusive language of section 164 of the Constitution is not only broad enough to, but that its terms do, include all intraurban franchises conferring the right of an extraordinary or privileged use of the streets or other public highways of the city, regardless of the means employed in rendering the service, provided such user is one of the *permanent* nature contemplated by that section. That the use of motor vehicles on public streets and highways for the transportation of passengers between fixed termini, etc., is the exercise of a franchise, there cain be no doubt. It was so held by us with reference to interurban highways in the Reo Bus Lines and Harrison cases, supra, and in the more recent case of Blue Coach Lines v. J. B. Lewis, etc., 220 Ky. 116, 294

S. W. 1080, we held that the operator of an interurban bus line, in the same manner of defendant's operation of its intraurban bus line, was not only exercising a franchise right, but that such right was subject to assessment for ad valorem taxes under the provisions of section 4077 of our present statute.

A franchise of the nature here involved was defined by us in the recent case of Irvine Toll Bridge v. Estill County, 210 Ky. 170, 275 S. W. 634, as a "privilege of doing 'that which does not belong to the citizens of the country generally by common right,' " and we further said therein "that no one inherently possesses the right to grant a franchise, except the sovereignty within which it is proposed to be exercised." It was, however, further pointed out in that opinion that it was competent for the sovereignty to delegate the right to grant the franchise to its municipalities or other political subdivisions, and our Constitution did that when sections 163 and 164, supra, were adopted. The one withheld the right of the Legislature to grant the franchise for purely intraurban operations, and conferred that right exclusively upon the city authorities, while the other prescribed a mandatory method by which the municipality might create and grant the francise to be operated exclusively, or substantially so, within its corporate limits.

Cases from the highest courts of 23 states besides Kentucky are cited in briefs, wherein it was held that one engaged in the operation of the business of a common carrier upon the public highways by motor power and between fixed termini was exercising an extraordinary privilege in the use of the traversed highways amounting to a franchise, and in our opinion in the Harrison case, supra, will be found others by the Supreme Court of the United States to the same effect. There is, therefore, no room for the contention that defendant, while engaged in the operation of its busses over the streets of Louisville in the manner hereinbefore pointed out was not doing so in the exercise of such a franchise as was and is contemplated by section 164, supra, of our Constitution. Indeed, we do not understand learned counsel for defendant as making a contrary contention, but they insist that the franchise mentioned in that section is one granted for *a term of years,* and since it acquired its privilege, under the enacted ordinance, supra, of the city from year

to year, its franchise or privilege is not "for a term of years," so as to bring it within the purview of the section.

In making that contention, counsel again ask us to accept the shadow for the substance. The same contention was made under exactly similar facts in the Hilliard case, supra, and in making an adverse disposition of it we therein said:

"In an effort to sustain this ordinance, counsel would make the expression 'for a term of years' the controlling feature of this section of the Constitution, and it may be remarked that, if it could be upheld at all, it must be upon the ground that the grant is not for a longer time than a year, or rather for less than a 'term of years.' But these words must be considered in connection with the remainder of the section, and are not entitled to, nor will they be given, the importance attached to them by counsel. The particular thing in the mind of the convention in drafting and considering this section was that the municipalities should derive substantial benefit from the sale of the valuable franchises and privileges at their disposal, and that boards and individual officials should not have the power to give them away to favored persons, or grant them for an inadequate consideration. It was not contemplated that any person or corporation would desire to purchase or obtain a franchise for the purpose of establishing a permanent and valuable improvement that would expire in one year, or be for a less period than a 'term of years,' and these words were inserted merely to give expression to this thought, rather than for any other purpose. Indeed, it does not seem either seasonable or probable that a corporation such as appellee would desire a privilege authorizing it to expend large sums of money in establishing a plant from which no profit could be gained until it was completed and put in operation, unless the right to enjoy it extended over 'a term of years.' So that in using these words the convention did not intend that the purpose of the section might be evaded by a grant for less than a 'term of years,' but rather that no grant for a permanent use for less than such term would ever be applied for."

In that case the George G. Fetter Lighting & Heating Company, a corporation, had obtained an annual license from the city, under an ordinance in substance the same as the one now under consideration, to construct and operate with the city a lighting and heating plant by which the citizens could be furnished light and heat, and Hilliard, an individual taxpayer, enjoined it from doing so upon the ground that it had obtained no franchise from the city as prescribed by section 164, supra. The corporation defended solely upon the ground now under consideration; i. e., that it was not attempting to exercise the conferred privileges on it by the ordinance "for a term of years," and for that reason the section did not apply. The above excerpt from that opinion is the potent answer to that contention.

In avoidance of it learned counsel for defendant stresses the fact that, while this court in that case denied the right to evade the requirements of the Constitution in the manner there as well as here attempted, yet it did so upon the construction that the contemplated utility or enterprise was permanent, and not temporary, as was therein evidenced by the fact that "permanent structures" were contemplated and necessarily to be erected by the owner of the privilege conferred by the city. It is therefore reasoned that, since no such structures are contemplated in this case, the rule therein announced does not apply. In other words, counsel's contention is that the lamented Judge Carroll, who prepared that opinion and who was a member of the constitutional convention, as well as all the members of this court in approving his opinion, were chargeable with the same contracted vision that we hereinbefore referred to with reference to the members of the constitutional convention. If there is an appearance in the Hilliard opinion of emphasis being placed upon the fact that "structures" were contemplated, and it therefore gave permanency to the enterprise, it was because of the fact that such were the facts in that case.

The dominant thought running throughout that opinion was and is that any such public utility operated in a city with contemplated permanency is required to obtain a franchise as prescribed by section 164 of the Constitution, and that the endurance of the user (i. e., as to its being permanent or temporary) was to be gathered from the cost of equipment (a large portion of which

was structures in the Hilliard case), coupled with the character of the service to be performed. To hold otherwise would be tantamount to saying that a franchise is not required *except* in cases where it becomes necessary to erect upon, under, or over the streets and alleys of the city some sort of fixed structure, howsoever insignificant it might be. We cannot conceive that a constitutionally declared purpose, as is incorporated in section 164 of the Constitution, should be made to turn upon such a trifing, shadowy, and unimportant fact. On the contrary, we prefer to believe that it was the intention and purpose of the constitutional delegates, as well as this court in its opinion in the Hilliard case, to test the requirements of the section by the character of *service* to be rendered, which are the produced *results,* regardless of the means or facilities that may be employed in the accomplishment.

But it will be observed from a reading of the Hilliard opinion that the determinating fact upon which it was based was the intended permanency of the use by the owner of the utility, and that such intention was to be gathered from the facts and circumstances of the case, chief among which was the *extent* of the investment for necessary equipment, and that the section of the Constitution applied to any "character of enterprise intended for lasting use by the public," and that the requirements of the Constitution could not "be evaded, or its purpose nullified, by making the grant for an indefinite period, or for less than a 'term of years,' or by any other scheme or device."

Moreover, it is the settled rule in the interpretation of Constitutions, statutes, and private writings that the intention of their makers, as gathered from the employed language and the purpose to be accomplished, should be applied. In arriving at such intention courts are not confined to the actual words employed, but to effectuate the evident purpose intended to be accomplished analogous situations and facts may be taken into consideration. Two illustrative domestic cases are the Irvine Toll Bridge case, supra, and Keen v. Ross, 186 Ky. 256, 216 S. W. 605. In the one we applied the ferry franchise requirement to the owner and operator of a toll bridge, since the operators of both bridge and the ferry were engaged in rendering the *same service* to the public,

which was the transporting of its members across the stream, and the insignificant fact of a difference in means by which that was done was given no weight.

In the Keen case a private contract was involved. One of the litigants had obligated himself to the other to not engage in the "livery business" for a designated time and at a designated place. He afterwards ran a taxicab, with which he performed the services of a liveryman, and we held that by doing so he violated his contract, notwithstanding the use of a taxicab was wholly foreign to livery business as originally understood and as defined in the books. We therefore conclude that the operation of defendant's busses over the streets of the city in the manner and for the purpose indicated, although it was not compelled to employ stationary, permanent structures in doing so was such a use of the streets for the purpose of performing such a public service as required it to obtain a francise as prescribed in section 164 of the Constitution, and that the evasive effort of the city council to nullify that section by conferring the privilege from year to year indefinitely (which was another violation of the same section) was unauthorized and cannot be sustained. It would appear to be needless for us to say that we do not mean to hold that the requirements of the section of the Constitution apply to all the private rights and privileges of the individual citizen which he and all others are guaranteed under the Bill of Rights, and which are protected by our constitutional guaranty of individually liberty. The "franchise" and "privilege" referred to in the section are such as we have hereinbefore discussed.

But a number of what may be termed alarming suggestions are made in opposition to the views hereinbefore expressed, and they are: (a) That to require a franchise in this instance would create in plaintiff a monopoly of the passenger transportation service in the city; (b) that such a franchise would be required by taxicabs and transfer companies, as well as others occupying any portion of the streets and alleys in the city, such as hawkers, circuses, tent performers, and others; and (c) that under the conclusions herein expressed interurban bus lines would be required to procure a franchise from all traversed municipalities. A sufficient answer to each of them is that it is our duty to decide the case before us, and take

care of the consequences afterwards. Neither of those questions is presented by the record, but, if they were, we would experience but little difficulty in disposing of them in a manner so as to dissipate such frightful apprehensions.

The Hilliard opinion successfully did so as to alarm (a), and also that part of alarm (b) relating to hawkers, peddlers, circuses, etc., and the remainder of that classification was answered in the comparatively recent case of Commonwealth of Kentucky v. Louisville Transfer Co., 181 Ky. 305, 204 S. W. 92. In that opinion it was pointed out that operators of taxicabs and those engaged in the local transfer business are only *casual* users of the streets, with no peculiar or extraordinary privileges above that of any other citizen. It is true that it was stated in that opinion that some of the qualities of a common carrier were possessed by the taximan, and also by the one in transferring freight and baggage; but that is only so while they are *actually* performing the service in transporting the passenger or freight. While so engaged they assume the obligations of a common carrier, but they run between no fixed termini, nor on any schedule, nor charge any fixed rate. Neither are they required by the common law to serve any and all applicants who might demand their services. It might also be added, as a further answer to classification (a) and in addition to what was said in the Hilliard case, that we held in the case of Louisville Home Telephone Co. v. City of Louisville, 130 Ky. 611, 113 S. W. 855, that it was competent for the city, in creating and offering a franchise for sale, to provide for the exclusion, as a bidder, of a competitor engaged in like operations to that contemplated by the offered franchise. Therefore the city of Louisville, if it should offer for sale a bus franchise, could exclude plaintiff as a bidder, and, if done, the alarm in this classification would fall to the ground.

Alarm (c) has also been answered, in effect, in the case of Diebold v. Kentucky Traction Co., 117 Ky. 146, 77 S. W. 674, 63 L. R. A. 637, 111 Am. St. Rep. 230, 4 Ann. Cas. 445, wherein we held that the exception in section 164 of the Constitution that "this section shall not apply to a trunk railway" included interurban carriers using electricity as a propelling power, the same as one using steam to produce such power, and that neither terminal nor traversed municipalities were required to

grant it a franchise. It requires no stretch of reasoning to apply that principle to an interurban carrier using motor power and employing vehicles supported by rubber-tired wheels, instead of iron wheels constructed to run on the rails of a fixed track. Since, therefore, terminal cities and those traversed by an interurban carrier may not exact from it a franchise under section 164 of the Constitution, this alarm also disappears.

From a most careful consideration of the case, we are constrained to the conclusion that the trial court properly granted the injunction, and the judgment is affirmed.

The whole court sitting, except Judge Dietzman, who was financially interested in one of the litigants.

Chief Justice Clay and Judge McCandless dissenting.

DISSENTING OPINION BY CHIEF JUSTICE CLAY.

In my opinion, the only way of measuring the vision of the makers of the Constitution is by what they said. Their language is:

"Sec. 164. No county, city, town, taxing district or other municipality shall be authorized or permitted to grant any franchise or privilege, or make any contract in reference thereto, for a term exceeding twenty years. Before granting such franchise or privilege for a term of years, such municipality shall first, after due advertisement, receive bids therefor publicly, and award the same to the highest and best bidder; but it shall have the right to reject any or all bids. This section shall not apply to a trunk railway."

The only limitations on the power of the municipality prescribed by the foregoing section are: (1) No franchise nor privilege shall be granted for a term exceeding twenty years. (2) No franchise nor privilege shall be granted *for a term of years*, except after due advertisement and a public sale to the highest bidder. There is nothing in this language from which it can be even remotely inferred that the framers of the Constitution intended that a franchise or privilege for less than a term of years should be sold to the highest and best bidder. It was not their purpose to fix an ironclad rule providing

that every privilege, regardless of the time it should run, should be sold to the highest and best bidder. They intended to leave it to the municipality to say whether it would grant a temporary privilege for less than a term of years, or would sell a more valuable privilege for a term of years. It is wholly immaterial that the person to whom a privilege or license is granted for one year intends to renew his license. He invests his money and incurs the risk of a repeal of the license ordinance, or of the decision of the municipality to sell a franchise or privilege for a term of years. To extend the meaning of the Constitution, and say that every privilege must be sold, and there is no escape from this conclusion under the rule announced in the majority opinion, is simply to tie the hands of the municipality, and commit it to an irrevocable policy that time may demonstrate to be wholly impracticable, or inimical to the safety or general welfare of the people. A pressure of work prevents a more extended expression of my views, but for the reasons indicated I am unable to concur in the majority opinion.

### DISSENTING OPINION BY JUDGE MCCANDLESS.

I fully concur in the dissenting opinion of Chief Justice Clay, and in addition to the cogent reasons urged by him, respectfully suggest that section 163 of the Constitution has no reference to franchises, but relates alone to easements. It forbids certain public service companies from obtaining an easement in the streets or public grounds of a municipality without obtaining its consent. Its provisions may be construed to embrace companies of like character, other than those named, who seek such easements, but it cannot apply to a motorbus transportation company, which neither seeks nor obtains an easement, and which uses the streets in the customary manner even though the use be extraordinary. Section 164 alone relates to franchises. It limits such grants to 20 years, and forbids a municipality from granting a franchise or a *privilege* for a term of years, except by public sale. Consistent therewith and aside from the maximum limit, it imposes no restrictions upon the power of a municipality to exercise its own discretion in fixing

the term of either a franchise or of a *privilege,* and in this respect makes no distinction between such *rights;* hence it is immaterial whether the right of the motorbus transportation company to use the streets is denominated a *franchise* or a *privilege.* Neither of these sections by its terms refers in any way to the other. However, the public service companies mentioned in section 163 usually expend large sums of money in the development of easements acquired by them, embracing improvements of a permanent character. Naturally they desire long-term franchises, and as a rule request such from the municipality; hence it has been assumed that it is essential for such corporations to procure a franchise for a term of years in order to operate. Indeed in Hilliard v. Fetter, cited in the majority opinion, the court reached the conclusion that a utility company did not apply for a yearly license in good faith; it appearing that the applicant had constructed expensive conduits in the street, which it would be difficult and expensive to remove. The court concluded that it was attempting to acquire a permanent easement, and refused to permit it to do this without purchasing a franchise for a term of years; the gist of the opinion being that the meaning of the words "term of years" is "that no grant for a permanent use for less than such time would be applied for."

Assuming the soundness of that opinion, it can have no application to the facts of this case. Here the bus company has no physical easement of any kind in the street. It has nothing in the way of physical improvements that will be difficult to remove, or that will become valueless at the end of the license period, and cannot acquire a permanent use of the streets by the grant of such license. True, it is a common carrier, and enjoys special privileges in the use of the streets. For this it may be regulated *by the municipality,* and required to pay a license or to purchase a franchise for a term of years, or altogether be prohibited from the use of the streets, if necessary for the public interest, in the discretion of the municipality. In this respect no distinction can be drawn between it and a taxicab company, or transfer company, which are also common carriers and continuously use the streets, and which this court has held not to be subject to a franchise tax. See Commonwealth v. Louisville Transfer Co., 181 Ky. 305, 204 S. W. 92. It is said, however, that it is performing the same duty as a street

railway company; that it operates between fixed termini and is a common carrier, using the streets in the same manner and for the same purpose as does a street railway company, and if one is required to purchase a franchise the same principles should apply to the other.

It may be conceded that the rival companies are organized for the same purpose and are to some extent analogous; the distinction being that the railway company has acquired a physical easement in the public streets, upon which it has expended large sums of money, and has by its own initiative procured a long-term franchise, and the court has held that such easements cannot be acquired for a single year, and this determining factor does not exist as to a bus company. The railway company required a long tenure for its own protection, and the constitutional provision guarded the public's rights by providing that the city authorities could grant such tenures only upon competitive bidding. In selling it such franchise, the city did not agree that it would not grant to others engaged in similar business along different lines a *privilege* to conduct such business, and to do this in any of the ways permitted by the Constitution, although this might create competition with the first grantee. Of course, if the grant is for a term of years, it must be sold; otherwise, not.

But it is said that the bus company has invested large sums in the purchase of equipment showing an intention of permanent operation, and it is the *intention to permanently engage in business* that should control. I do not think this tenable. No doubt the taxicab companies have also invested large sums in rolling stock, but, should either of these companies cease to do business in Louisville, the rolling stock could be transferred elsewhere; hence the amount of such investment is not a factor in a determination of the case. Also, if the tenure of the privilege to be granted is to be determined by the intention of the parties to continue longer in business, it would apply alike to all occupations, professions, and businesses in which a special right or privilege is conferred or a license tax imposed, because the *public sale* provision of section 164 includes all *privileges*. Most professional and business men contemplate remaining in the city of their location for a longer period than one year, and it would be farcical to say that a yearly license could not be granted to such persons. It may be that the city would derive more

revenue from a sale of a 20-year franchise to a bus transportation company than it would to charge annual license fees. On the other hand, an ordinance regulating motor-busses and fixing license fees may be changed from year to year as the business develops, so as to produce far more revenue than would be derived from the sale of a franchise. But who is to determine this?

As we have seen, the Constitution has wisely left the determination of this question to the municipality itself, and it is authorized to do so by the Legislature. To my mind the construction adopted in the majority opinion has the effect of nullifying the discretion thus vested in the municipality, and denies to cities an opportunity to cautiously try out grants sought of them, and renders them unable to learn the value of the proposed grant for a period of years before it is given. It may result in their selling, often for a song, grants for years, the full value of which cannot be foreseen, and thus by irrevocable contract fix upon their streets servitudes covering long periods, and confer rights of immense value for an inadequate consideration, because, when applied for and sold, the proposed use is by reason of its experimental stage of unknown value.

The achievements of science and the effects of those achievements on our lives cannot be foreseen. When new uses of our streets and ways are proposed, and this is a new one, no one can with any degree of accuracy foretell just how extensive or how valuable such use will be, or how much burden and inconvenience will result from it. And thus to deny cities an opportunity to proceed with caution, and learn in advance some of the privileges they are bestowing, may result in great financial loss, not only to Louisville, but to the other municipalities of the state. I do not think the language or the spirit of the Constitution admits of a construction preventing them from so doing, and therefore respectfully dissent.